```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ALABAMA
                       SOUTHERN DIVISION
```

FILED
02 SEP 16 PM 2:45
N.D. OF DISTRICT COURT
ALABAMA

CORDELL MILLER,           )
                          )
    Plaintiff,            )
                          )   CIVIL ACTION NO.
v.                        )
                          )   01-AR-0701-S
TYSON FOODS, INC.,        )
                          )
    Defendant.            )
                          )

ENTERED
SEP 16 2002

## MEMORANDUM OPINION

Before the court is a motion for summary judgment filed by defendant, Tyson Foods, Inc. ("Tyson"), and a motion for summary judgment filed by plaintiff, Cordell Miller ("Miller"). Miller, an African-American male, contends he was subjected to a hostile work environment on the basis of race, sex, and in retaliation for filing an EEOC charge. Miller also contends that the retaliatory treatment by Tyson resulted in his constructive discharge. He asserts these claims under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.

### Statement of Undisputed Pertinent Facts

Miller began working for Tyson at its Blountsville plant in 1997. He worked as a general laborer until he resigned in January of 2001.

On March 16, 1998, Miller filed an EEOC charge against Tyson alleging that he had been harassed on the basis of his sex and

1

48

race. Miller's complaint was merged with claims asserted by other employees at the Blountsville plant which were pending before the United States District Court in *Dumas v. Tyson,* CV-93-C-2688-S. On July 9, 1999, Chief Judge U.W. Clemon entered a Consent Decree that resolved all of the claims brought by Miller and the other plaintiffs in that case.

After the earlier claims against Tyson were resolved through the 1999 Consent Decree Miller began keeping detailed handwritten notes about every incident that he felt worthy of recording. Miller assumed that retaliation would be forthcoming even though no one at Tyson told him he would be the object of retaliation or threatened him. Miller states, "I knew I would be retaliated against when I went back in the plant . . . [T]hat's why I kept my pad and pencil with me everywhere I went so whenever something happened, I wrote it down."

Miller's notes describe several incidents he contends constituted harassment/retaliation. Miller concedes that he has no evidence to suggest that any of the employees about whom he complained even knew that he had prior legal claims against Tyson. Most of the incidents involve confrontations with co-employees; only four involve conduct by supervisors. The summary of incidents is as follows:

1) In July of 1999, a Latino co-worker ignored Miller and blocked his way to his work area.

2

2) In September of 1999, a different Latino co-worker allegedly called Miller "way." Miller did not know what the word meant in Spanish, but says a co-worker told him that it meant "castrated bull." Miller concedes that the co-worker never called him "way" again after he complained to his supervisor.

3) In November of 1999, Miller was tapped on his hard hat two or three times by a co-worker. That same day a Latino co-worker did not hold the elevator door open for him long enough for him to enter.

4) In November of 1999, someone allegedly opened Miller's locker and cut off the earplugs on his cap, and another employer sped up the assembly belt line which made the wing tips come into his area, requiring him to work at a brisker pace.

5) In December of 1999, a Latino co-worker allegedly whistled at Miller. The co-worker never whistled at Miller again after that incident.

6) In January 2000, Miller presented a doctor's excuse to his supervisor stating that he should be allowed to frequently use the restroom due to a medical condition. Thereafter, Miller's supervisor instructed Miller that he should not be leaving his work area without first notifying his supervisor. No disciplinary action was taken against him for leaving his work station to go to the bathroom.

7) In January of 2000, a Latino co-worker tapped Miller on

3

his hard hat with a butt of a wing tip knife. Miller complained to his supervisor. The co-worker did not tap him on the head again after that one occasion.

8) In February 2000, Miller passed a Hispanic co-worker and said "hi, amigo," to which the Hispanic man allegedly responded "hey, Americon." Miller claims that "some Mexicans" told him the word "Americon" means faggot or homosexual. He also contends he was called "punta," which Miller contends means faggot or homosexual in Spanish. Miller never complained to any supervisor about this incident.

9) In February of 2000, Miller went to the nurse's station to ask for some medication. A Latino co-worker whistled at him and told him the nurse might be outside. Miller told the Latino co-worker not to whistle at him again. Miller reported this incident to his supervisor. Miller acknowledges that his supervisor tried to help identify who whistled at him.

10) In August of 2000, Miller was asked by his supervisor to go upstairs in the plant to do some work. Miller refused. No disciplinary action was taken against Miller for his refusing to go to work upstairs. In November of 2000, a supervisor asked Miller to help some other workers on a different line while he had spare time. Miller refused. No disciplinary action was taken against Miller for his refusal to help those other workers.

11) In September of 2000, Miller was tapped on the head with

4

a shovel by a Latino co-worker. Miller complained to a supervisor and had no further problems with the co-worker. In October of 2000, Miller was tapped on the head by another Latino co-worker. Miller complained to his supervisor and had no further problems with this co-worker.

12) In December 2000, Miller had a dispute with Jude Cambray and supervisor, Karie Gaylord. His supervisors asked him to pick up chicken wing tips off the floor. Miller argued that it was not his job to perform the task and said that the supervisors' request constituted "job performance harassment." During the conversation, Miller referred to Karie Gaylord, who happens to be black, as "brother," and Jude Cambray suggested that Miller's use of the word "brother" constituted a "bias statement." Miller responding by accusing Cambray of being a racist. Miller claims that the supervisors were trying to provoke him to violence.

Tyson's written Harassment Policy provides two methods for employees to make complaints of harassment and retaliation. One method is a toll free hotline. The second method identifies specific Tyson Harassment Investigators who may be contacted. The policy expressly provides in capital letters that: "YOU SHOULD RECOGNIZE THAT IT IS YOUR RESPONSIBILITY TO PERSONALLY MAKE THE REPORT TO ONE OF THE FOLLOWING GROUPS." Miller concedes that he never made any attempt to use either of these two methods to bring to Tyson's attention the conduct about which he complains

5

in this action. He made some verbal complaints to his supervisors but he never contacted a Tyson Harassment Investigator. It was his belief that the supervisors should have been required to draft complaints on his behalf. He contends that his supervisors did not prepare written complaints on his behalf because "they're trying to hide this. . .that way, I wouldn't have any proof when I got into court." Miller admits he never requested a supervisor to fill out a complaint form on his behalf.

The *Dumas* Consent Decree provides a detailed internal complaint procedure for employees to follow. The Consent Decree acknowledges that employees may bypass the internal complaint procedures and go straight to the EEOC. However, it also provides that a plaintiff may suffer adverse legal consequences for failing to use the complaint mechanism provided in the Consent Decree. Miller was familiar with the terms of the Consent Decree. Yet, despite the decree, his training, and the signed notice advising him that it was his responsibility to make the report of harassment to a Tyson Harassment Investigator, Miller chose not to do so. He admits he was aware of the procedures but claims "I didn't have any trust in that."

## **Analysis**

A hostile work environment claim under Title VII is established upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is

sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). To establish a hostile work environment claim a plaintiff must show: (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability. *See, e.g., Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999)(applying these factors in the context of a hostile environment sexual harassment claim).

In order to survive summary judgment, a plaintiff claiming hostile work place harassment must produce evidence that the behavior alleged to constitute unlawful harassment was based on the protected characteristics at issue. *Gupta v. Florida Board of Regents*, 212 F.3d 571 (11th Cir. 2000), *cert. denied*, 531 U.S. 1076 (2001). In order to constitute sexual harassment the statements must be of a sexual or gender-related nature before they are considered in determining whether the severe or

7

pervasive requirement is met. *Id.* at 583.

Tyson asserts that Miller has not produced any evidence to support findings in his favor that the conduct about which he complains was directed at him because of his race, sex, or because he filed an EEOC charge. Miller contends that some of the comments made to him suggested he was a homosexual. Miller cites *Oncale v. Sundowner Offshore Service Inc.*, 523 U.S. 75 (1998) as support for his claim that harassment can constitute prohibited sex discrimination under Title VII when the harasser and harassed are the same sex. Although this may be true, harassment based on an employee's homosexuality, as opposed to gender, is not protected under Title VII. Furthermore, the *Oncale* court also stated that "Title VII does not prohibit all verbal or physical harassment in the workplace" and that Title VII is not a "general civility code." *Id.* at 80.

Miller himself testified that the actions directed at him were not based upon his sex or his race. He says instead that the incidents of complaint were in retaliation for his earlier complaints. However, Miller has not produced any evidence that any of the people who committed the allegedly harassing conduct even knew that Miller had filed an EEOC charge or that they had a retaliatory motive. Most of the individuals involved were unidentified Latino co-workers.

Tyson also argues that Miller has not offered any evidence

8

to suggest that the harassment was severe or pervasive. To give rise to a hostile work environment claim, the harassment must be sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment. *Gupta v. Florida Board of Regents*, 212 F.3d 571, 583 (11th Cir. 2000), *cert. denied*, 531 U.S. 1076 (2001). The environment must be one that a reasonable person would find hostile and abusive. *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999), *cert. denied*, 529 U.S. 1068 (2000). "In deciding whether a hostile environment was created, factors to consider include the frequency of the discriminatory conduct, the severity of the discriminatory conduct, whether the conduct is threatening or humiliating, and whether the conduct unreasonably interferes with the plaintiff's performance at work." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1989).

    Miller claims that he was hit on the head by chicken parts thrown by unidentified co-workers, "whistled at," bumped on the head on a few occasions, bumped into by a co-worker and hit by the shovel he was carrying, called "wey," "Americon," and "punta," having his earplugs cut off his hat after his locker was broken into, reprimanded by a supervisor for using the restroom when Miller had a doctor's excuse and having disputes over job assignments. He states that the conduct was unwelcome and had not been invited or solicited by his own actions or statements. He

9

argues that a reasonable person would have found the workplace to be hostile and that he personally believed the workplace environment was hostile. Miller also claims that the jury finding in 1995 finding that Tyson had a hostile work environment demonstrates that the work environment was viewed as hostile by reasonable persons.

Miller complains of incidents that fall short of what is required to show an objectively hostile work environment. Although the work environment at Tyson four years ago may have been hostile, the incidents complained of here are trivial and annoying at best. There was no humiliating or threatening conduct, no interference with job performance, and the conduct was not severe. Miller has failed to produce sufficient evidence needed to raise a genuine issue of material fact that his working conditions were intolerable. These events occurred over a period of more than a year and half. Miller took notes and complains about virtually every incident that occurred in the workplace that he disliked.

Miller has produced some evidence to show that he was being treated by a doctor for stress in the workplace. However, Miller has failed to present any evidence that raises a genuine dispute of material fact that the protected characteristics motivated the conduct about which he complains.  Furthermore, the incidents Miller complains of are not enough to constitute actionable

10

harassment as a matter of law. Therefore, Tyson is entitled to judgment as a matter of law on the hostile work environment claim.

Assuming *arguendo* that Miller has established a *prima facie* case, Tyson asserts the affirmative defense established in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Industries Inc. v. Ellerth*, 524 U.S. 742 (1998). Under *Faragher* and *Ellerth*, the employer is not liable for the hostile work environment created by one of its supervisors if the employer proves: (1) that it exercised reasonable care to prevent and correct promptly any harassing behavior; and (2) that the plaintiff unreasonably failed to take advantage of the preventative or corrective opportunities provided by the employer to avoid the harm or otherwise failed to avoid the harm. *Ellerth*, 524 U.S. at 765. If an employer has effectively promulgated a workable anti-harassment policy, then it has met its burden under the first element of the *Faragher/Ellerth* defense. *See Faragher*, 524 U.S. at 765; *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290 (11thCir. 2000), *cert. denied*, 531 U.S. 926 (2000). The employer must also show that its complain procedure provides multiple avenues for lodging a harassment complaint. *Madray*, 208 F.3d at 1298-99.

Miller tries to distinguish his case from the *Faragher/Ellerth* cases because neither of those defendants was

under a previously entered federal injunction, and neither of those defendants had a "zero tolerance" policy in effect as Tyson does. This distinction actually supports Tyson's motion for summary judgment rather than raises a genuine dispute of material fact.

The first element of the *Faragher/Ellerth* affirmative defense has two sub-parts; prevention and correction. Tyson has clearly met its obligation as to prevention by undisputed proof of its having promulgated and distributed to its employees, including Miller, a valid anti-harassment policy. Miller received training regarding the policy and the complaint procedure. The Consent Decree also provided multiple avenues of complaint and had been court approved. The Consent Decree clearly fulfilled Tyson's preventive and corrective obligations.

Tyson also argues that it exercised reasonable care to prevent any harassing behavior. Miller's supervisors tried to promptly correct any harassing behavior that may have occurred. On most of the occasions Miller could not even identify the alleged harasser. However, the incidents did not occur again after Miller complained. An employer cannot be expected to correct harassment unless the employee makes an effort to inform the employer the problem exists. *See Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1366 (11th Cir. 1999). These types of vague and informal complaints can hardly place the employer on notice.

*See Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290 (11th Cir. 2000). It is very difficult for an employer to root out racial harassment if the harassed employee does not report the harassment to the employer. Once Miller did make an official complaint during his exit interview to a proper Tyson official as designated under the Consent Decree Tyson conducted a full scale investigation.

The second element of the affirmative defense requires Tyson to prove that Miller failed to take advantage of corrective opportunities afforded him by Tyson. Tyson argues that Miller did not claim he "feared" using the system; he just did not do so because he felt "it was, to me, just seemed like something -- just something set up to benefit Tyson and not for anyone to file a complaint against them. It was just something to basically protect them." Tyson argues, however, that no one from Tyson ever told Miller anything that would lead him to that conclusion and his failure to use the internal complaint procedure was unreasonable as a matter of law.

Miller admitted that he was aware of the fact that Tyson could use his failure to process his complaint under the decree against him. Miller refused to submit a written complaint to Tyson although he was compiling a year and half's worth of pages of handwritten notes about every single incident that displeased him. Miller claims he made reports to the proper officials but

13

he does not submit any evidence to support this assertion. Once he did complain to the proper officials, on the advice of counsel, he refused to discuss the issue at all with Tyson. Therefore, for purposes of summary judgment, Miller failed to take advantage of the corrective opportunities afforded by Tyson. As a result, Tyson's motion for summary judgment on the hostile work environment claim is due to be granted.

Secondly, Miller alleges he was constructively discharged. To establish a constructive discharge claim, Miller must prove that Tyson rendered his working conditions so intolerable that he was compelled to quit involuntarily. *See Hill v. Winn Dixie, Inc.*, 934 F.2d 1518, 1527 (11th Cir. 1991). The working conditions must have been so intolerable that a "reasonable person in the employee's shoes would have felt compelled to resign." *Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987). Tyson argues that the conduct about which Miller complains is not sufficient to support a hostile work environment claim and it is also insufficient to meet the higher standard required for constructive discharge claims. *See Hipp v. Liberty National Life Insurance Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001)(The standard for proving constructive discharge is higher than the standard for proving a hostile work environment."), *cert. denied*, 122 S.CT. 1064 (2002). In response, Miller merely states the legal conclusion that he was

subjected to such a pervasively hostile work environment that it was adversely affecting his health.

The party opposing summary judgment must set forth specific facts showing that there is a need for trial. Restating a pleading or making mere conclusory allegations fails to set forth specific facts requiring a need for trial; assertions are not facts. Miller's constructive discharge claim fails for the same reasons as his hostile work environment claim. Miller has not produced sufficient evidence to establish an essential element of the claim that the working environment was so intolerable a reasonable person would be compelled to quit.

Miller also argues that the lack of remedial action on the party of Tyson management, which permitted the harassment to continue, left Miller with no choice except to resign his employment. In *Kilgore v. Thompson & Brock Mgt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996), the Eleventh Circuit held that an employer is entitled to summary judgment on a constructive discharge claim if the employee does not give the employer sufficient time to remedy the situation. As discussed above, Miller never made any efforts to seek redress under the complaint procedure provided in the Consent Decree. Miller's decision to ignore the procedures laid out in the Consent Decree and to quit was based solely on his own unfounded opinion that the complaint procedure would be ineffective. Miller did not return to work

15

after he complained to the proper officials at Tyson. He did not allow sufficient time for Tyson to remedy the situation if this was a situation that called for its attention.

Lastly, Miller is claiming that he was retaliated against by Tyson. To establish a *prima facie* case of retaliation, a plaintiff must show: (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) the adverse action was casually related to the protected expression. *See Weaver v. Casa Gallardo*, 922 F.2d 1515, 1524 (11th Cir. 1991). It is undisputed that Miller engaged in protected activity, in that, he filed an EEOC charge alleging discrimination in 1998. However, Tyson argues that Miller cannot make a sufficient showing on the other two elements of his *prima facie* case.

Tyson asserts that the trivial incidents about which Miller complains are not "objectively serious and tangible enough" to give rise to a retaliation claim. *See Gupta v. Florida Board of Regents*, 212 F.3d 571, 583 (11th Cir. 2000), *cert. denied*, 531 U.S. 1076 (2001). In *Gupta* the court held that an adverse employment action is an ultimate employment decision, such as discharge, failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment. *Id*. at 587. The court recognized that in evaluating whether actions meet the required level of substantiality Title

16

VII is not a general civility code nor a statute making actionable the ordinary tribulations of the workplace. *Id*. Miller argues that the adverse employment action he was subjected to was a hostile work environment and constructive discharge. Miller failed to produce any evidence that the individuals who allegedly created the "hostile work environment" even knew that Miller had previously filed an EEOC charge in 1998 or that he had filed one in 2000. Furthermore, the acts of fellow employees with no supervisory authority do not create liability for the employer unless encouraged or ratified, and there is no such evidence.

Miller also filed a motion for summary judgment in which he merely restates his claims for hostile work environment, constructive discharge, and retaliation. Miller's summary judgment motion is due to be denied because the court is granting Tyson's motion for summary judgment on all of Miller's claims. Miller suggests that, in the alternative, the court should find that Tyson violated the Consent Decree and Miller is entitled to a trial on the issue of damages for this violation. Miller does not cite any authority to support these assertions. Miller has refused to follow the procedures in the Consent Decree and he cannot now pursue a claim under the Consent Decree.

### Conclusion

This court, by separate order, will grant Tyson's motion for summary judgment and deny Miller's motion for summary judgment.

DONE this __16th__ day of September, 2002.

                                        */s/ William M. Acker*
                                  WILLIAM M. ACKER, Jr.
                                  UNITED STATES DISTRICT JUDGE